Filed 3/20/13  P. v. Rotroff CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>DENIS KEITH ROTROFF,<br><br>  Defendant and Appellant. | H033527<br>(Santa Clara County<br> Super. Ct. No. 210929) |

In 2009, this court affirmed an October 22, 2008 order committing Denis Keith Rotroff to an indeterminate term as a sexually violent predator ("SVP").  (See Welf. & Inst. Code, § 6600 et seq.)[1]  After Rotroff petitioned for review, the Supreme Court granted review and subsequently, following its decision in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*), transferred the matter to this court.  The Supreme Court directed this court to vacate our decision and to reconsider the cause in light of *McKee*.  The court's order further provided: "In order to avoid an unnecessary multiplicity of proceedings, the court is additionally directed to suspend further proceedings pending

---

[1]  All further statutory references are to Welfare and Institutions Code unless otherwise specified.

1

finality of the proceedings on remand in McKee . . . . 'Finality of the proceedings' shall include the finality of any subsequent appeal and any proceedings in this court."

Following trial on remand and appeal, the Fourth District, Division One, issued *People v. McKee* (2012) 207 Cal.App.4th 1325 ("*McKee II*"). The Supreme Court denied McKee's petition for review (review den. Oct. 10, 2012, S204503). The *McKee* case on remand is now final. Accordingly, we now reconsider this case in light of the Supreme Court's *McKee* decision.

We conclude that appellant Rotroff's claims lack merit.

I

*Procedural History*

Appellant Rotroff waived a jury trial and submitted the petition to extend his commitment as an SVP for decision based upon documentary reports. The trial court found, beyond a reasonable doubt, that appellant was an SVP and ordered him committed for an indeterminate term. (§ 6604.) On appeal, appellant challenges the constitutionality of the Sexually Violent Predator Act (SVPA) as amended by Proposition 83 in 2006.

II

*Discussion*

A. *Single Subject Rule*

Appellant maintains that Proposition 83[2] violated the single subject rule because it "combined too many disparate topics without a common purpose under a broad and amorphous theme of dealing with sex offenders." The single subject rule is expressed in two constitutional provisions, one applicable to statutes and the other applicable to

---

[2]    We take judicial notice of the Voter Information Guide prepared by the Secretary of State for the November 7, 2006 election insofar as it concerns Proposition 83. (Evid. Code, §§ 452, 459.)

initiative measures.  California Constitution, article II, section 8, subdivision (d), which applies to initiatives, provides:  "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."[3]

The single subject rule is "a constitutional safeguard adopted to protect against multifaceted measures of undue scope" and "forbids joining disparate provisions which appear germane only to topics of excessive generality such as 'government' or 'public welfare.' "  (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 253.)  "The single subject rule as applied to the initiative has the dual purpose of avoiding log-rolling and voter confusion.  (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 . . . .)"  (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1098.)  It is intended to avoid passage of a measure that combines "provisions which might not have commanded majority support if considered separately" and to "minimize the risk of voter confusion and deception.  [Citation.]"  (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231.)

The California Supreme Court has "construed our two single subject provisions in an accommodating and lenient manner so as not to unduly restrict the Legislature's or the people's right to package provisions in a single bill or initiative.  [Citations.]" (*Californians For An Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764.)  It has "found the single subject rules to have been satisfied so long as challenged provisions meet the test of being *reasonably germane* to a common theme, purpose, or subject.  [Citations.]"  (*Ibid*., fn. omitted.)

In *Brosnahan v. Brown, supra,* 32 Cal.3d 236, 248, it was argued that Proposition 8, commonly known as "The Victims' Bill of Rights," violated the single subject rule

---

[3]     With respect to statutes, article IV, section 9 of the California Constitution provides in pertinent part: "A statute shall embrace but one subject, which shall be expressed in its title.  If a statute embraces a subject not expressed in its title, only the part not expressed is void."

3

because it contained "disparate provisions covering a variety of 'unrelated' matters such as school safety, restitution, bail, diminished capacity, and the like."  The California Supreme Court concluded that the proposition met "the 'reasonably germane' standard" because "[e]ach of its several facets bears a common concern, 'general object' or 'general subject,' promoting the rights of actual or potential crime victims."  (*Id*. at p. 247.)  The court stated: "As explained in the initiative's preamble, the 10 sections were designed to strengthen procedural and substantive safeguards for victims in our criminal justice system.  These changes were aimed at achieving more severe punishment for, and more effective deterrence of, criminal acts, protecting the public from the premature release into society of criminal offenders, providing safety from crime to a particularly vulnerable group of victims, namely school pupils and staff, and assuring restitution for the victims of criminal acts."  (*Ibid*.)  The "readily discernible common thread" uniting the initiative's provisions was the goal of protecting and enhancing the rights of crime victims.  (*Ibid*.)

In *Manduley v. Superior Court* (2002) 27 Cal.4th 537, the Supreme Court upheld Proposition 21 against various claims that it violated the single subject rule.  (*Id*. at pp. 573-581.)  Its provisions related to Three Strikes law, criminal gang activity, and the juvenile justice system.  (*Id*. at pp. 574-575.)  The court determined that "[t]he general object of the initiative is to address the problem of violent crime committed by juveniles and gangs."  (*Id*. at pp. 575-576.)  It decided: "[T]he provisions of Proposition 21 that change laws regarding gang-related crime and the juvenile justice system are reasonably germane to each other and to the initiative's common purpose of addressing violent crime committed by juveniles and gangs."  (*Id*. at p. 576.)  It further determined that "[r]evising the list of violent and serious felonies to add crimes for which juveniles and gang members can receive increased penalties is reasonably germane to the initiative's general purpose of addressing juvenile and gang-related crime," "[e]ven if some of the crimes

4

added to the list of violent and serious felonies are *more likely* to be committed by an adult who is not a gang member," because "the offenses nonetheless constitute crimes that commonly are committed by members of street gangs and/or juvenile offenders" (*id*. at p. 578).

In this case, the separate provisions of Proposition 83 are "reasonably germane to a common theme, purpose, or subject" of protecting the public against the commission of sex offenses. Appellant has not identified any provision that falls outside this common purpose. The fact that the measure affected both Welfare and Institutions Code and Penal Code sections is not determinative. (See *Manduley v. Superior Court*, *supra*, 27 Cal.4th at pp. 574-575.) While appellant complains that the proposition reflects a "scattered shotgun approach to diverse topics," he concedes that these topics "relate broadly to sex offenses." The single subject rule does not require that each of the provisions of an initiative measure effectively interlock in a functional relationship. (*Id.* at p. 575.)

In addition, we must reject appellant's assertion that the public probably misunderstood that "SVP proceedings were civil in nature" since we assume the voters duly considered and comprehended the voter materials. (*Id*. at p. 580.) The proposition's official summary prepared by the Attorney General, which is contained in the Official Voter Information Guide, explicitly stated up front, underneath the official title: "Changes current two-year involuntary *civil commitment* for a sexually violent predator to an indeterminate commitment, subject to annual review by the Director of Mental Health and subsequent ability of sexually violent predator to petition court for sexually violent predator's conditional release or unconditional discharge." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) official title and summary of Prop. 83, p. 42, italics added.) One of the proposition's express findings supporting the changes in the SVPA stated in part: "California is the only state, of the number of states that have enacted laws allowing involuntary *civil commitments* for persons identified as sexually violent

5

predators, which does not provide for indeterminate commitments." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, subd. (k), p. 127, italics added; see Historical & Statutory Notes, 47C West's Ann. Pen.Code (2008) foll. § 209, pp. 52–53.)

Proposition 83 does not violate the single-subject requirement of article II, section 8, subdivision (d), of the California Constitution. (See *People v. Kisling* (2011) 199 Cal.App.4th 687, 693-694; *People v. Keister* (2011) 198 Cal.App.4th 442, 451-452.)

B. *Constitutional Challenges to Indeterminate Term of Commitment for SVP's*

1. *Due Process*

Appellant maintains that the revised SVPA, by providing for an indeterminate term of commitment for persons determined to be SVP's and placing the burden of proof for release on the committee, "creates an unacceptable risk that an SVP detainee who no longer qualifies as a sexually violent predator will have his commitment continued in violation of his right to due process." He insists that due process requires "periodic and mandatory hearings in which the government bears the burden of proof." He indicates that a petition under section 6605, which places the burden of proof on the state (§ 6605, subd. (d)) but requires administrative preauthorization (§ 6605, subd. (b)), does not satisfy due process. He also argues that a petition for conditional release or unconditional discharge under section 6608 does not satisfy due process because, although it had no preauthorization requirement, it assigns the burden of proof to the SVP committee, it allows the superior court to summarily dismiss frivolous petitions, and it does not provide for the appointment of a defense expert if the committee is indigent.

Substantially similar arguments were raised, and addressed by the California Supreme Court, in *McKee*. (*McKee*, *supra*, 47 Cal.4th at pp. 1188-1193.) The Supreme Court reasoned that an initial finding beyond a reasonable doubt that a person meets the definition of an SVP is "for present constitutional purposes, the functional equivalent of the NGI acquittal in *Jones* [*v. United States* (1983) 463 U.S. 354 [103 S.Ct. 3043].]" (*Id.*

at p. 1191.) It concluded that "as in *Jones*, the requirement that McKee, after his initial commitment, must prove by a preponderance of the evidence that he is no longer an SVP does not violate due process." (*Ibid*.)

As to the summary denial of a frivolous petition under section 6608, the Supreme Court stated in *McKee*: "A frivolous petition is one that 'indisputably has no merit.' (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [defining frivolous appeals].) . . . The fact that the statute gives the court the authority to deny such petitions does not, of itself, serve as an obstacle to the primary due process goal of ensuring that only those individuals who continue to meet SVP criteria will remain involuntarily committed." (*McKee*, *supra*, 47 Cal.4th at p. 1192, fn. omitted.) It recognized that SVP committees are not precluded "from challenging an erroneous judicial determination that a petition is frivolous. [Citation.]" (*Id*. at p. 1192, fn. 6.)

In *McKee*, the court recognized that "expert testimony is critical in an SVP commitment proceeding . . . ." (*Id*. at p. 1192.) It determined: "Given that the denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe section 6608, subdivision (a), read in conjunction with section 6605, subdivision (a), to mandate appointment of an expert for an indigent SVP who petitions the court for release." (*Id*. at p. 1193.)

The Supreme Court observed: "After Proposition 83, it is still the case that an individual may not be held in civil commitment when he or she no longer meets the requisites of such commitment. An SVP may be held, as the United States Supreme Court stated under similar circumstances, 'as long as he is both mentally ill and dangerous, but no longer.' (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77 [ . . . 112 S.Ct. 1780].)" (*Id*. at p. 1193.) It held that the amended SVPA, as construed, "does not violate

7

the due process clause." (*Ibid*.)  This court is bound by the Supreme Court's holding.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

2. *Equal Protection*

a. *Contentions on Appeal*

Appellant Rotroff argues that his indeterminate commitment as an SVP with limited judicial review of his commitment violates the equal protection clause of the Fourteenth Amendment because he is being treated more harshly than similarly situated mentally disordered offenders (MDO's) (see Pen. Code, § 2960 et seq ) and persons found not guilty of a crime by reasons of insanity (see Pen. Code, §§ 1026, 1026.2, 1026.5).  He compares the indeterminate term of commitment under the SVPA to the one-year commitment term for MDO's.  (See Pen. Code, § 2972, subd. (c); see also Pen. Code, § 2970.)  He points out that insanity acquittees have a right under Penal Code section 1026.2 to be heard on an application for release after 180 days of confinement.[4]  By way of comparison, SVP committees cannot bring a petition for conditional release or unconditional discharge under section 6608 until at least one year from the date of the

---

[4]    Penal Code section 1026.2, subdivision (a), provides in part: "An application for the release of a person who has been committed to a state hospital or other treatment facility, as provided in Section 1026, upon the ground that sanity has been restored, may be made to the superior court of the county from which the commitment was made, either by the person, or by the medical director of the state hospital or other treatment facility to which the person is committed or by the community program director where the person is on outpatient status under Title 15 (commencing with Section 1600)."  Penal Code section 1026.2, subdivision (d), states: "(d) No hearing upon the application shall be allowed until the person committed has been confined or placed on outpatient status for a period of not less than 180 days from the date of the order of commitment."  In *People v. Soiu* (2003) 106 Cal.App.4th 1191, which is cited by appellant, an appellate court held, as a matter of statutory interpretation, that a trial court cannot summarily deny a Penal Code section 1026.2 release request without holding an outpatient placement hearing.  (*Id*. at p. 1197.)

8

commitment order.  (§ 6608, subd. (c).)  Such a petition may be denied without a hearing if it is frivolous.  (§ 6608, subd. (a).)

Appellant Rotroff maintains that the disparate treatment of SVP's "violates the equal protection guarantees of the Fourteenth Amendment because it is not justified by a compelling state interest."  He does not argue that there is a compelling state interest at stake but the state could have used less onerous means of accomplishing its objectives.

b.  *McKee* and *McKee II*

In *McKee*, the California Supreme Court recognized that persons civilly committed as MDO's or persons whose commitments are extended after being found not guilty by reason of insanity (NGI's) are subject to short, definite terms of commitment whereas persons found to be SVP's are committed to an indeterminate term of commitment.  (*People v. McKee*, *supra*, 47 Cal.4th at pp. 1202, 1207.)  It concluded that SVP's were similarly situated to these other groups of committees.  (*Id*. at pp. 1204, 1207.)  The court found "no question that, after the initial commitment, an SVP is afforded different and less favorable procedural protections than an MDO."  (*Id*. at p. 1202.)  It found merit in the contention that NGI's and SVP's are similarly situated for purposes of equal protection.  (*Id*. at p. 1207.)  The court declared that where groups are similarly situated and "the state makes the terms of commitment or recommitment substantially less favorable for one group than the other, . . . it is required to give some justification for this differential treatment."  (*Id*. at p. 1203.)

The Supreme Court explained: "When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether *the legislative body ' "has drawn reasonable inferences based on substantial evidence*." '  [Citations.] . . . Therefore, the legislative findings recited in the

9

ballot initiative do not by themselves justify the differential treatment of SVP's." (*Id*. at pp. 1206-1207, italics added.)

The Supreme Court then concluded in *McKee* that "neither the People nor the courts below properly understood" the People's burden of justifying the differential treatment of SVP's and the People should be given the opportunity to meet that burden. (*Id*. at pp. 1207-1208.) The court remanded the matter to the trial court "to determine whether the People, applying the equal protection principles articulated in [*In re Moye* (1978) 22 Cal.3d 457] and related cases discussed in [its] opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment."[5] (*Id*. at pp. 1208-1209, fn. omitted.) It stated: "On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's

---

[5] In *In re Moye* (1978) 22 Cal.3d 457, an equal protection claim required the California Supreme Court to compare the class of persons confined as mentally disordered sex offenders (MDSO's) with the class of persons who have been confined after being acquitted of a criminal offense by reason of insanity (NGI's). (*Id*. at pp. 463-465.) Both groups were confined for treatment "in lieu of criminal punishment" (*id*. at p. 463) but the duration of their commitments were different. (*Id*. at pp. 464-465.) The court stated: "Because petitioner's personal liberty is at stake, the People concede that the applicable standard for measuring the validity of the statutory scheme now before us requires application of the strict scrutiny standard of equal protection analysis. Accordingly, the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest. [Citation.]" (*Id*. at p. 465.) It held, based on equal protection principles, that "persons committed to a state institution following acquittal of a criminal offense on the ground of their insanity cannot be retained in institutional confinement beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted." (*Id*. at p. 467.)

10

electorate." (*Id*. at p. 1210, fn. omitted.)  The trial court must "determine not whether the statute is wise, but whether it is constitutional." (*Id*. at p. 1211, fn. omitted.)

On remand, "[f]ollowing a 21–day evidentiary hearing, the trial court concluded the People met their burden to justify the disparate treatment of SVP's under the standards set forth in *McKee*." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330.)  On appeal to the Fourth District, Division One, McKee contended that "the trial court erred by finding the People met that burden." (*Ibid*.)  The appellate court concluded "the trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id*. at pp. 1330-1331.)

Appellant Rotroff contends that *McKee II* does not properly resolve his equal protection claims because the appellate court (1) failed to conduct a proper de novo review and (2) misapplied the strict scrutiny test.  He urges this court to reject the conclusions of *McKee II*.

*McKee II* clearly stated that it was conducting a de novo review: "McKee asserts, and we agree, that we review de novo the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights.  We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the Act.  Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review.  [Citations.]  Furthermore, because in this case the trial court presumably

11

did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination.  Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim."  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.)

Appellant claims that, although the appellate court in *McKee II* stated it was conducting a de novo review, it failed to do so.  He asserts that the appellate court erred by determining "whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests.  [Citations.]"  (207 Cal.App.4th at p. 1339.)  Appellant also claims that although "early in the opinion, the *McKee II* court took note of the evidence presented by both sides, its actual analysis concerned only the prosecution's evidence."

*McKee II*'s description of its review is entirely consistent with an independent, de novo review of the evidence and the Supreme Court's opinion and directions in *McKee*.  (See *McKee*, *supra*, 47 Cal.4th at pp. 1206-1211.)  Our careful review of *McKee II* does not demonstrate that the appellate court failed to independently consider all the evidence presented by the parties, including McKee's evidence.  As the Supreme Court in *McKee* emphasized, "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments."  (*Id*. at p. 1210.)

As to the strict scrutiny standard of review, appellant Rotroff asserts that the appellate court in *McKee II* misapplied the standard and the evidence did not "show a compelling state interest that makes it necessary to impose upon SVP's a burden of proof and a term of commitment different from that which applies to MDO's and NGI's."  The appellate decision does not support these claims.

12

In *McKee II*, the appellate court examined evidence in three areas: recidivism, the greater trauma of victims of sexual offenses, and the diagnostic and treatment differences. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1347.)  With respect to recidivism, the appellate court concluded that the Static–99 evidence supported "by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Id*. at p. 1342.)  That evidence included Department of Mental Health data "showing a significant difference between the Static–99 scores of SVP's and those of MDO's/NGI's." (*Id*. at p. 1341.)  "The average Static–99 score for all SVP's civilly committed since the passage of the amended Act in 2006 [was] 6.19," which "place[d] SVP's in the 'high' risk category for sexual reoffense." (*Ibid*.)  In contrast, the average Static–99 score for MDO's at Patton State Hospital subject to sex offender registration requirements in 2010 was only 3.6, which placed them "in the 'moderate-low' risk category for sexual reoffense." (*Ibid*.)  The average Static–99 score for all patients discharged from Atascadero State Hospital since January 1, 2010 and subject to sex offender registration requirements, a group including MDO's and NGI's, was 4.6, which placed them "in the 'moderate-high' risk category for sexual reoffense." (*Id*. at pp. 1341-1342.)

In *McKee II*, the appellate court further concluded that there was "substantial evidence supporting the reasonable perception that the nature of the trauma caused by sex offenses is generally more intense or severe than the trauma caused by nonsex offenses and is sometimes unique to sex offenses." (*Id*. at p. 1343.)  It discussed the evidence supporting its conclusion. (*Id*. at pp. 1342-1343.)

*McKee II* also determined that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different." (*Id*. at p. 1347.)  The distinctions

13

made SVP's more difficult to treat and less likely to participate in treatment. (*Ibid*.) SVP's were "less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative." (*Ibid*.)

The evidence discussed in *McKee II* indicated that "[o]nly 2 percent of MDO's and NGI's suffer from pedophilia or other paraphilias" whereas "nearly 90 percent of SVP's are diagnosed with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.) "Dr. David Fennell, a psychiatrist and chief of forensics at Atascadero State Hospital, testified that about 90 percent of MDO and NGI patients suffer from a psychotic mental disorder" but "only 1 to 3 percent of SVP's suffer from a psychosis." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.)

There was also evidence that "[p]araphilia typically remains stable or constant throughout a patient's lifetime." (*Id*. at p. 1345.) "Although there may be an 'aging out' effect where patients' behavior or acting out on their fantasies is decreased as they age, that does not mean their urges and fantasies are similarly decreased. Patients with paraphilia generally have a specific intent in selecting victims (e.g., boys age seven to 10 years) and carefully plan and execute their offenses (e.g., by 'grooming' their victims before committing the offense). In contrast, patients with severe mental illnesses generally are not that organized and commit impulsive or opportunistic offenses." (*Ibid*.)

The appellate court in *McKee II* reviewed the evidence of significant differences in the treatment of severely mentally ill patients and patients with paraphilia. "Patients with severe mental illnesses generally are first treated with psychotropic medications and then with psychosocial support or intervention (e.g., therapy regarding communication skills, social skills, and problem solving). Their amenability to and compliance with treatment usually is very good. Most severely mentally ill patients are compliant with their medications and participate in treatment most of the time. In comparison, the treatment plans for patients with paraphilia generally involve psychosocial intervention-like

14

treatment.  Medications may decrease their sexual arousal, but not their deviant sexual interests.  Treatment of paraphilia patients takes longer than for other patients because paraphilia is so pervasive, affecting their thoughts, beliefs, and interactions. . . . Also, a higher percentage of SVP's (i.e., 10 to 15 percent) have antisocial or borderline personality disorders (i.e., involving pathological lying and instability, etc.) than do severely mentally ill patients, making their treatment more difficult.  Also, unlike severely mentally ill patients, 'not very many' SVP's are ready to work and participate in treatment."  (*Id*. at p. 1346.)

Dr. Fennell also provided testimony regarding the differences between treatment plans for SVP's and those for MDO's and NGI's.  (*Id*. at p. 1345.)  "MDO's, most of whom are housed at Atascadero, are overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support treatment.  About two-thirds of MDO's and NGI's comply with their treatment programs, typically resulting in their decertification after about three years."  (*Id*. at pp. 1344-1345.)  In contrast, "SVP's treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending."  (*Id*. at p. 1345.)  "The shortest time in which an SVP has completed treatment is two and one-half years.  Many other SVP's took up to five years to complete treatment."  (*Ibid*.)  But "only about 25 percent of SVP's participate in treatment."  (*Ibid*.)

*McKee II* concluded "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released).  (*McKee*, *supra*, 47 Cal.4th at p. 1207.)"  (*McKee II*, 207 Cal.App.4th at p. 1347.)  It held that the SVPA as amended did not "violate McKee's constitutional equal protection rights."  (*Id*. at p.

15

1348.)  Appellant Rotroff has not demonstrated that the appellate court's conclusions were incorrect.

We briefly address Rotroff's assertion that *McKee II* erred by not analyzing whether the state had proved that its disparate treatment of SVP's "constituted the least restrictive means possible."  The appellate court in *McKee II* was unpersuaded that "the equal protection clause requires that disparate treatment of similarly situated classes be not only necessary to further a compelling state interest, but also accomplished through the least restrictive means available."  (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1348-1349.)  It did not believe that "the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered."  (*Id*. at p. 1349.)

While we agree that the availability of *equally efficacious* but less burdensome means of accomplishing a compelling state interest is a consideration in strict scrutiny analysis,[6] the appellate court clearly understood that the strict scrutiny test required the

---

[6]    See e.g. *Zablocki v. Redhail* (1978) 434 U.S. 374, 388 [98 S.Ct. 673] ["When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.  [Citations.]"], 389 [statute precluding state resident with judicially imposed child support obligations from marrying without court permission held unconstitutional where "the State already ha[d] numerous other means for exacting compliance with support obligations, means that are at least as effective as the instant statute's and yet do not impinge upon the right to marry"]; *Dunn v. Blumstein* (1972) 405 U.S. 330, 342 [92 S.Ct. 995] ["durational residence laws [for voting] must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are 'necessary to promote a compelling governmental interest.'  [Citations.]"], 343 ["It is not sufficient for the State to show that durational residence requirements further a very substantial state interest.  In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity.  Statutes affecting constitutional rights must be

16

government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*Ibid*.) Narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339 [123 S.Ct. 2325].)

We presently have no indication that some determinate term would equally or as effectively serve the compelling state interests at stake and appellant Rotroff has not made any such claim. Given the evidence presented in *McKee II* that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, a paraphilia ordinarily persists throughout a patient's lifetime, treatment is not focused on medication, and most SVP's do not participate in treatment (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1344-1345), we have no basis for concluding that an indeterminate term is not necessary to further the compelling state interest in providing treatment to SVP's and protecting the public or that there is any less burdensome alternative to effectuate those interests.[7] (See *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20.)

---

drawn with 'precision,' [citations], and must be 'tailored' to serve their legitimate objectives. [Citation.] And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' [Citation.]."

[7] A determinate term would also be wasteful of limited public resources if most committees continue to qualify as SVP's and do not participate in treatment. Among the People's findings that are recited in Proposition 83 is the following: ". . . California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, subd. (k), p. 127; see Historical & Statutory Notes, 47C West's Ann. Pen.Code (2008) foll. § 209, pp. 52–53.)

In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings, the Supreme Court's denial of review in *McKee II*, and our conclusions regarding the asserted flaws in *McKee II*, we find the equal protection claims advanced by appellant are without merit and do not require a remand for a further evidentiary hearing.

3. *Ex Post Facto and Double Jeopardy Prohibitions*

Appellant contends that his indeterminate commitment under the SVPA is punitive in purpose or effect and, therefore, violates the federal constitutional prohibitions against ex post facto laws and double jeopardy. He maintains that consideration of the factors set forth in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168-169 [83 S.Ct. 554] compels the conclusion that the changes made to the SVPA by Proposition 83 are punitive in effect.

The double jeopardy clause of "[t]he Fifth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment (*Benton v. Maryland* (1969) 395 U.S. 784, 793-796 [89 S.Ct. 2056 . . .]), protects defendants from repeated prosecution for the same offense [citations], by providing that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb. . . .' " (*People v. Batts* (2003) 30 Cal.4th 660, 678.) It "protects only against the imposition of multiple *criminal* punishments for the same offense, *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938); see also [*U. S. ex rel. Marcus v. Hess* (1943) 317 U.S. 537,] 548-549, 63 S.Ct., at 386-387 ('Only' 'criminal punishment' 'subject[s] the defendant to "jeopardy" within the constitutional meaning'); *Breed v. Jones*, 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975) ('In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution') . . . ." (*Hudson v. U.S.* (1997) 522 U.S. 93, 99 [118 S.Ct. 488].) "The Ex Post Facto Clause, which ' "forbids the application of any new punitive measure to a crime already

18

consummated," ' has been interpreted to pertain exclusively to penal statutes. [Citation.]" (*Kansas v. Hendricks* (1997) 521 U.S. 346, 370 [117 S.Ct. 2072].) A judicial determination that a law is not punitive "removes an essential prerequisite" for both double jeopardy and ex post facto claims. (*Ibid.*)

In *McKee, supra*, 47 Cal.4th 1172, the Supreme Court concluded: "[T]he nonpunitive objectives of the Act—treatment for the individual committed and protection of the public—remain the same after Proposition 83. Moreover, under the Act after Proposition 83, as before, a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness. As such, the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the Act." (*Id*. at p. 1194.)

After considering "the seven-factor test articulated in *Kennedy v. Mendoza–Martinez* (1963) 372 U.S. 144, 168-169 . . . 83 S.Ct. 554" (*McKee*, *supra*, 47 Cal.4th at p. 1195), the Supreme Court held that "the Proposition 83 amendments do not make the Act punitive and accordingly do not violate the ex post facto clause." (*Ibid*.) This court is governed by the Supreme Court's holding. (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.) Its determination is also dispositive of appellant Rotroff's double jeopardy claim.

C. *First Amendment Right of Petition*

Appellant claims that the SVPA violates his right under the first amendment to the U.S. Constitution to petition the government for redress of grievances because the act as amended limits his access to the courts and does not provide "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." He points to section 6605, subdivision (b), which requires administrative authorization before an SVP committee may petition for conditional release or

19

unconditional discharge under that provision. He maintains that this statutory limitation is "analogous to the regulation in *Ex Parte Hull,*" which was held unconstitutional.

Section 6605's administrative authorization requirement is not equivalent to the administrative regulation held unconstitutional in *Ex Parte Hull* (1941) 312 U.S. 546 [61 S.Ct. 640]. The petitioner in *Ex parte Hull* was a state prisoner. A prison official had refused to notarize Hull's petition for writ of habeas corpus and accept it for mailing and prison guards had confiscated the petition after Hull had delivered the papers to his father for mailing outside the prison. (*Id*. at pp. 547-548.) Hull was eventually able to pass a document to the Supreme Court through his father. (*Id*. at p. 548.) In response to the Supreme Court's order to show cause why leave to file a petition for writ of habeas corpus should not be granted, the state prison warden invoked a regulation that provided: " 'All legal documents, briefs, petitions, motions, habeas corpus proceedings and appeals will first have to be submitted to the institutional welfare office and if favorably acted upon be then referred to Perry A. Maynard, legal investigator to the Parole Board, Lansing, Michigan. Documents submitted to Perry A[.] Maynard, if in his opinion are properly drawn, will be directed to the court designated or will be referred back to the inmate.' " (*Id*. at pp. 548-549.)

The Supreme Court in *Hull* held that the prison regulation was invalid because "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." (*Id*. at p. 549.) The court stated: "Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine. [Citations.]" (*Ibid*.) In the present case, no administrative regulation limits a committed person's right to apply for habeas corpus relief in federal or state court. (See § 7250 [any person who has been committed to a state hospital for the mentally disordered is entitled to a writ of habeas corpus upon proper application].)

Appellant has provided no authority to suggest that the constitutional right to petition government restricts the power to legislate. The scope of any statutory right to petition under section 6605 or section 6608 is delineated by the legislating body.

We also observe that, although the statutory right to petition under section 6605, subdivision (b), is conditional, section 6608, subdivision (a), provides a right to petition that is not dependent upon administrative authorization. Appellant Rotroff maintains that the right to petition under section 6608 does not offer "meaningful access to the courts" because it does not provide for appointment of a medical expert that a petitioner would need to prove the petition. This claim has been completely eliminated by *McKee*'s interpretation of section 6608 as including the right to "appointment of an expert for an indigent SVP who petitions the court for release." (*McKee*, *supra*, 47 Cal.4th at p. 1193.)

Appellant Rotroff also complains that section 6608, subdivision (a), permits courts to summarily deny frivolous petitions filed under that section. He has cited no authority for the proposition that the constitutional right to petition forces courts to hear and decide frivolous petitions.

The Supreme Court held in *Bounds v. Smith* (1977) 430 U.S. 817, 828 [97 S.Ct. 1491] that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." (*Lewis v. Casey* (1996) 518 U.S. 343, 354 [116 S.Ct. 2174].) "The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts. E.g., Bounds,* 430 U.S., at 817, 821, 828, 97 S.Ct., at 1492-1493, 1494, 1498. In the cases to which *Bounds* traced its roots, [the Supreme Court] had protected that right by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents, *e.g., Johnson v. Avery,* 393 U.S. 483, 484, 489-490, 89 S.Ct.

21

747, 748, 750-751, 21 L.Ed.2d 718 (1969), or file them, *e.g., Ex parte Hull,* 312 U.S. 546, 547-549, 61 S.Ct. 640, 640-642, 85 L.Ed. 1034 (1941) . . . ."  (*Id*. at p. 350.)

In his concurring opinion in *Bounds*, Justice Powell stated: "The decision today recognizes that a prison inmate has a constitutional right of access to the courts to assert such procedural and substantive rights as may be available to him under state and federal law.  It does not purport to pass on the kinds of claims that the Constitution requires state or federal courts to hear."  (*Bounds v. Smith*, *supra*, 430 U.S. at p. 833.)

In *Lewis v. Casey*, *supra*, 518 U.S. 343, the U.S. Supreme Court indicated that an actual injury was a "constitutional perquisite" for claiming a violation of the right to court access (*id*. at pp. 351-352) and an inmate was required to "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded" (*id*. at p. 353, fns. omitted).  The court noted that "[d]epriving someone of a frivolous claim . . . deprives him of nothing at all."  (*Id*. at p. 353, fn. 3.)

In *Christopher v. Harbury* (2002) 536 U.S. 403 [122 S.Ct. 2179], a widow brought a complaint alleging that official deception concerning her late husband, who had been held and tortured in another country, had denied her "access to the courts by leaving her without information, or reason to seek information, with which she could have brought a lawsuit that might have saved her husband's life."  (*Id*. at p. 405.)  The U.S. Supreme Court stated its court access cases "rest on the recognition that the right [to court access] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."  (*Id*. at p. 415.)  It then said: "We indicated as much in our most recent case on denial of access, *Lewis v. Casey*, *supra*, where we noted that even in forward-looking prisoner class actions to remove roadblocks to future litigation, the named plaintiff must identify a 'nonfrivolous,' 'arguable' underlying claim [citation] and we have been given no reason to treat backward-looking access claims any differently in this respect."  (*Ibid*.)

22

In the different context of defamation, the U.S. Supreme Court has considered "whether the Petition Clause of the First Amendment provides absolute immunity to a defendant charged with expressing libelous and damaging falsehoods in letters to the President of the United States." (*McDonald v. Smith* (1985) 472 U.S. 479, 480 [105 S.Ct. 2787].) In determining that the petition clause did not provide absolute immunity from damages for libel, the Supreme Court observed that its "decisions interpreting the Petition Clause in contexts other than defamation" did not "indicate that the right to petition is absolute." (*Id*. at p. 484.) It noted, "[f]or example, filing a complaint in court is a form of petitioning activity; but 'baseless litigation is not immunized by the First Amendment right to petition.' *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983); accord, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972)." (*Ibid*.)

The SVPA as amended by Proposition 83 does not deny appellant the right of meaningful access to the courts.

## DISPOSITION

The order of commitment filed October 22, 2008 is affirmed.

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.



_____
PREMO, J.

24